JUSTICE MORRIS
specially concurs.
¶20 Winston Churchill observed in a speech before the House of Commons in 1947 that “[djemocracy is the worst form of government except for all of those other forms that have been tried from time to time.” Direct democracy removes the filter of the voters’ elected representatives and takes the audacious step of posing questions directly to the voters. Montana voters originally adopted the initiative process in 1906 as part of the incomplete effort to cast aside the “copper collar” that bedeviled Montana politics for much of the 20th century.
¶21 Montana’s 1972 Constitutional Convention considered carefully the issue of whether to continue this experiment in direct democracy. The delegates opted to include in the Constitution an express right of the people to amend the Constitution or enact laws through the initiative process. Mont. Const., art. Ill, Sec. 4. This considered decision by the delegates to the 1972 Constitutional Convention followed more than 65 years of experience with the initiative system in place. The people’s right to constitutional and statutory initiatives represents “a unique and important retained power.” State ex rel. Montana Sch. Bd. v. Waltermire, 224 Mont. 296, 299, 729 P.2d 1297, 1299 (1986). Its inclusion in the Constitution “emphasizes the degree of control the people desired to retain” over changes to the Constitution or statutes. Id.
*247 ¶22 The initiative process allows citizens to put before voters issues that their elected representatives either have chosen not to address, or more likely, have been unable to resolve. These issues range from the enlightened, such as Constitutional Amendment 3, commonly known as the coal severance tax trust fund; to the controversial, Constitutional Amendment 64, the term limits initiative, Initiative 143, restricting trophy hunting on game farms, Initiative 122, protection of water quality from metal mines, and Initiative 125, prohibiting corporate contributions to ballot issue campaigns; to the banal, Constitutional Amendment 25, a provision that added the public retirement system to the State’s unified investment program. The initiative process relies on the wisdom of the voters to separate sound policy proposals from the fad of the month-type proposals. For better or worse, the right to amend the Constitution or enact laws by initiative has served the people of Montana for more than a century.
¶23 The Dissent oozes with hostility toward this initiative process. The Dissent editorializes about the knowledge, or lack thereof, that “most voters” possess with respect to a policy proposal. ¶ 65, n.4. The Dissent fails to inform where it gains its insights into the minds of “most voters.” I believe these questions best left to pollsters and political scientists.
¶24 This same lack of confidence in the knowledge of the voters animates the Dissent’s “bait-and-switch fraud” argument. The Dissent suggests that this Court’s minor revisions to the Attorney General’s ballot statement could lead to certain voters unwittingly signing a petition in support of an initiative that they otherwise would not support. This argument ignores the fact that the law requires all petitions for signatures to include a statement of purpose, statements of implication, fiscal impact statement, if required, and a complete copy of the proposed initiative. Sections 13-27-202 and -312, MCA.
¶25 The statement of purpose represents only a summary of the proposed initiative. Interested voters have the opportunity to read the entire petition, if they choose, before deciding whether to sign the petition. The legislature empowered the Court to amend the ballot statement to reflect more accurately the initiative’s intent. The legislature did not authorize the Court to amend the language of the proposed initiative itself. The Court has not changed one jot of the language of the proposed initiative. This safeguard protects against any effort to “mislead the voters’-whether that effort be made by the Attorney General, the initiative proponents, or any other party that the Dissent assumes may seek to dupe the unwary citizenry.
*248 ¶26 The Dissent next suggests that the Court favors a party to this dispute. ¶ 67, n.5. The Dissent implies that the Court has disregarded its constitutional oath of office by taking sides in a case. Mont. Const., art. Ill, Sec. 3. I take seriously my responsibility to decide cases without bias or partiality to any party. Canons of Jud. Ethics, Rule 2.2. I am sure that my colleagues do the same. In fact, this Court scrupulously has avoided taking sides in this dispute. The Court simply has sought to provide a remedy to this dispute in a manner that complies with the statutory scheme developed by the legislature. The legislative remedy allows this Court the ability to revise the Attorney General’s statement of purpose to reflect more accurately the intent of the proposed initiative. Section 13-27-316(3)(c)(ii), MCA.
¶27 The Court has elected to pursue this remedy. In choosing an appropriate remedy, the Court must be guided by principle that “initiative and referendum provisions of the Constitution should be broadly construed to maintain the maximum power in the people.” Nicholson v. Cooney, 265 Mont. 406, 411, 877 P.2d 486, 488 (1994); Chouteau County v. Grossman, 172 Mont. 373, 378, 563 P.2d 1125, 1128 (1977). The maximum power in the people requires that the people be given the opportunity to vote on an initiative when the requisite number of voters have signed petitions to qualify a measure for the ballot and the proponents of the measure have complied with the statutory scheme put in place by the legislature.
¶28 The Dissent snickers over the Court’s use of the term “statutory scheme” to describe the system enacted by the 2007 Legislature to address the process by which an initiative may qualify for the ballot and by which a party may challenge that process. The snickering infers that the statutes enacted to address this process represent some sort of con game designed to trap unwary voters. The Dissent suggests that proponents of initiatives could avoid these traps for the unwary by getting their acts together early in the process. The Dissent proposes that initiative proponents could gather sufficient signatures months in advance of the deadline, obtain all of the necessary clearances from the Secretary of State and the Attorney General, defend the matter before this Court, and then, if the Court decided to revise slightly the ballot statement, collect the thousands of signatures all over again before the statutory deadline. This proposal would gut the people’s constitutional right to initiative. The fact that Montana voters face only a handful of proposed constitutional and statutory initiatives at each election cycle reflects the difficulty of qualifying a proposed initiative for the ballot. The Dissent’s proposal would eliminate even these handfuls of *249 proposals from consideration by the people.
¶29 The Dissent finally blithely recommends that the people demand that their elected representatives regulate interest rates if “such a public hullabaloo” actually exists over these interest rates. ¶ 73. The people of Montana ensured that they would not be without power to address issues of policy-whether accompanied by a “public hullabaloo” or simply supported by a group of concerned people-when they adopted the initiative system. The delegates to the 1972 Constitutional Convention confirmed the wisdom of this approach. The people need not rely on their elected representatives to enact a law that would restrict interest rates charged by certain lenders. Article II, Section 3 of our Constitution enshrines that right. I would not undermine this power. I support the Court’s remedy to revise the Attorney General’s ballot statement for 1-164 to reflect more accurately the Initiative’s intent.
JUSTICE LEAPHART joins in the foregoing special concurrence.